IRELL & MANELLA LLP
David A. Schwarz (State Bar No. 159376)
DSchwarz@irell.com
1800 Avenue of the Stars, Ste. 900
Los Angeles, CA 90067–4276
Tel:  310–277–1010
Fax: 310–203–7199

PETA FOUNDATION
Jeffrey S. Kerr (admitted *pro hac vice*)
JeffK@petaf.org
1536 16th Street NW
Washington, DC 20036
Tel:  202–540–2171
Fax:  202–540–2208

Matthew Strugar (State Bar No. 232951)
Matthew-s@petaf.org
Martina Bernstein (State Bar No. 230505)
MartinaB@petaf.org
2154 W. Sunset Boulevard
Los Angeles, CA 90026
Tel:  323–739–2701
Fax:  213–484–1648
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NARUTO, a Crested Macaque, by and through his Next Friends, PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC., and ANTJE ENGELHARDT, Ph.D. <br><br> Plaintiff, <br><br> vs. <br><br> DAVID JOHN SLATER, an individual, BLURB, INC., a Delaware corporation, and WILDLIFE PERSONALITIES, LTD., a United Kingdom private limited company, <br><br> Defendants. | Case No.: 15-cv-4324-WHO <br><br> PLAINTIFF NARUTO'S COMBINED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS <br><br> Judge: Hon. William H. Orrick <br><br> Date:      January 6, 2016 <br> Time:     2:00 p.m. <br> Courtroom:  2, 17th Floor <br><br> Complaint filed September 21, 2015 |

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ............................................................................................... 1

II.  STATEMENT OF RELEVANT FACTS ........................................................... 3

III. LEGAL STANDARD ........................................................................................ 4

IV.  ARGUMENT ..................................................................................................... 5

    A.   Animals Have Standing To Sue Under The Copyright Act ..................... 5

    B.   "Authorship" Under The Copyright Act Does Not Exclude Animals ................... 7

    C.   The Copyright Act Must Be Interpreted Broadly .................................... 10

    D.   No Authority Has Addressed Animal Authorship ................................... 13

    E.   The Complaint Alleges A Concrete, Redressable Injury ........................ 17

    F.   This Court Should Not Rule On The Merits ............................................ 18

V.   CONCLUSION ................................................................................................. 20

# TABLE OF AUTHORITIES

**Page**

## Cases

*Aalmuhammed v. Lee,*
    202 F.3d 1227 (9th Cir. 2000) ........................................................................................ 6

*Action Tapes, Inc. v. Mattson,*
    462 F.3d 1010 (8th Cir. 2006) ...................................................................................... 12

*Bartok v. Boosey & Hawkes, Inc.,*
    523 F.2d 941 (2d Cir. 1975) ................................................................................... 16, 17

*Bell Atl. Bus. Sys. Servs., Inc. v. Hitachi Data Sys. Corp.,*
    No. C 93-20079 JW, 1995 WL 836331 (N.D. Cal. Dec. 14, 1995) ................................ 12

*Best Life Assur. Co. v. Comm'r,*
    281 F.3d 828 (9th Cir. 2002) ........................................................................................ 13

*Bleistein v. Donaldson Lithographing Co.,*
    188 U.S. 239 (1903) ..................................................................................................... 15

*Boyds Collection, Ltd. v. Bearington Collection, Inc.,*
    360 F. Supp. 2d 655 (M.D. Penn. 2005) ...................................................................... 16

*Burrow-Giles Lithographic Co. v. Sarony,*
    111 U.S. 53 (1884) ................................................................................................. passim

*Cetacean Community v. Bush,*
    386 F.3d 1169 (9th Cir. 2004) ......................................................................... 2, 5, 7, 13

*Chicago Bd. of Educ. v . Substance, Inc.,*
    354 F.3d 624 (7th Cir. 2003) ........................................................................................ 17

*Christensen v. Harris County,*
    529 U.S. 576 (2000) ..................................................................................................... 16

*Cmty. for Creative Non-Violence v. Reid,*
    490 U.S. 730 (1989) ................................................................................................. 6, 12

*D.C. v. Heller,*
    554 U.S. 570 (2008) ..................................................................................................... 10

*DC Comics v. Towle,*
    802 F.3d 1012 (9th Cir. 2015) ........................................................................................ 6

*Defenders of Wildlife v. Gutierrez,*
    532 F.3d 913 (D.C. Cir. 2008) ................................................................................. 5, 18

*DeSylva v. Ballentine,*
    351 U.S. 570 (1956) ..................................................................................................... 16

*Doe v. Walker,*
    193 F.3d 42 (1st Cir. 1999) ........................................................................................... 19

**Page**

*Durham Industries, Inc. v. Tomy Corp.*,
  630 F.2d 905 (2d Cir. 1980) ................................................................................ 8

*Eldred v. Ashcroft*,
  537 U.S. 186 (2003) ....................................................................................... 1, 11

*Elec. Constr. & Maint. Co., Inc. v. Maeda Pac. Corp.*,
  764 F.2d 619 (9th Cir. 1985) ......................................................................... 5, 19

*Epstein v. Washington Energy Co.*,
  83 F.3d 1136 (9th Cir. 1996) ................................................................................ 5

*Ets–Hokin v. Skyy Spirits, Inc.*,
  225 F.3d 1068 (9th Cir. 2000) ............................................................................ 15

*Garcia v. Google, Inc.*,
  786 F.3d 733 (9th Cir. 2015) .............................................................................. 12

*Goldstein v. California*,
  412 U.S. 546 (1973) ..................................................................................... 6, 10

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
  471 U.S. 539 (1985) ........................................................................................... 11

*Imperial Toy Corp. v. Goffa Int'l Corp.*,
  988 F. Supp. 617 (E.D.N.Y. 1997) ....................................................................... 8

*Jewelers' Circular Pub. Co. v. Keystone Pub. Co.*,
  274 F. 932 (2d Cir. 1921) ................................................................................... 15

*John Wiley & Sons, Inc. v. DRK Photo*,
  998 F. Supp. 2d 262 (S.D.N.Y. 2014) ................................................................... 5

*Lamie v. U.S. Trustee*,
  540 U.S. 526 (2004) ............................................................................................. 5

*Lee v. City of Los Angeles*,
  250 F.3d 668 (9th Cir. 2001) ................................................................................ 4

*Los Angeles News Service v. Tullo*,
  973 F.2d 791 (1992) ........................................................................................... 15

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ........................................................................................... 17

*Mason v. Jamie Music Pub. Co.*,
  658 F. Supp. 2d 571 (2009) ................................................................................ 11

*McGary v. City of Portland*,
  386 F.3d 1259 (9th Cir. 2004) ................................................................... 5, 19, 20

PLAINTIFF'S OPPOSITION TO MOTIONS TO DISMISS

1

**Page**

2

3   *Monge v. Maya Magazines, Inc.*,
4        688 F.3d 1164 (9th Cir. 2012)....................................................................... 17

*North Coast Indus. v. Jason Maxwell, Inc.*,
5        972 F.2d 1031 (9th Cir. 1992)........................................................................ 14

6   *Nottage v. Jackson*,
7        11 Q.B.D. 627 (1883).................................................................................... 7

*Obergefell v. Hodges*,
8        135 S.Ct. 2584 (2015) ................................................................................... 13

9   *Okinawa Dugong v. Gates*,
10       543 F. Supp. 2d 1082 (N.D. Cal. 2008) ........................................................ 5

*PDK Labs., Inc. v. DEA*,
11       362 F.3d 786 (D.C. Cir. 2004) ...................................................................... 10

12  *Perfect 10, Inc. v. Amazon, Inc.*,
13       508 F.3d 1146 (9th Cir. 2007)................................................................ 17, 19

*Playboy Enterprises Inc. v. Dumas*,
14       53 F.3d 549 (2d Cir. 1995)............................................................................. 8

15  *Silvers v. Sony Pictures Entertainment, Inc.*,
16       402 F.3d 881 (9th Cir. 2005)........................................................................ 5

*Skidmore v. Swift & Co.*,
17       323 U.S. 134 (1944)...................................................................................... 16

18  *Sony Corp. of Am. v. Universal City Studios*,
        464 U.S. 417 (1984)........................................................................... 1, 11, 17
19
*Thomas v. New York City*,
20       814 F. Supp. 1139 (E.D.N.Y. 1993).............................................................. 19

21  *Trade-Mark Cases*,
22       100 U.S. 82 (1879)........................................................................................ 14

*U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*,
23       692 F.3d 1009 (9th Cir. 2012)....................................................................... 6

24  *United States v. Kane*,
        2013 WL 5797619 (D. Nev. Oct. 28, 2013)................................................ 19
25
*United States v. Mead Corp.*,
26       533 U.S. 218 (2001)...................................................................................... 16

27  *United States v. Paramount Pictures*,
        334 U.S. 131 (1948)...................................................................................... 11
28

**Page**

*Urantia Foundation v. Maaherra*,
    114 F.3d 955 (9th Cir. 1997).................................................................. 14

*Warren v. Fox Family Worldwide, Inc.*,
    328 F.3d 1136 (9th Cir. 2003)............................................................ 8, 18

*Worldwide Church of God v. Philadelphia Church of God, Inc.*,
    227 F.3d 1110 (9th Cir. 2000)................................................................ 17

## Statutes

17 U.S.C. § 101 ....................................................................................... passim

17 U.S.C. § 102(a).................................................................................. passim

17 U.S.C. § 106 ............................................................................................ 17

17 U.S.C. § 106(1) ................................................................................. 17, 19

17 U.S.C. § 201(a)........................................................................... 6, 11, 13

17 U.S.C. § 201(b) ........................................................................................ 8

17 U.S.C. § 203 ............................................................................................ 10

17 U.S.C. § 302(c)......................................................................................... 9

17 U.S.C. § 304 ............................................................................................ 10

17 U.S.C. § 409(3) ........................................................................................ 9

17 U.S.C. § 411(a)....................................................................................... 14

17 U.S.C. § 501(b) ............................................................................. 5, 17, 19

35 U.S.C. § 100(f) ......................................................................................... 9

42 U.S.C. § 287a-3a ...................................................................................... 4

5 U.S.C. § 551(2) .......................................................................................... 8

5 U.S.C. § 701(b)(2) ..................................................................................... 8

## Other Authorities

H. Rep. No. 1476, 94th Cong., 2d Sess. 51 (1976) ....................................... 8

Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT (2015)....................... 2

U.S. Const., Art. I, § 8 ............................................................................. 6, 10

U.S. Const., Art. III ................................................................................... 5, 8

- v -

PLAINTIFF'S OPPOSITION TO MOTIONS TO DISMISS

**Page**

**Rules**

Fed. Rule Civ. Proc. 17(c)...................................................................................4, 11

5114200

1        Plaintiff Naruto ("Naruto"), by and through his next friends, People for the Ethical

2   Treatment of Animals, Inc. ("PETA"), and Antje Engelhardt, Ph.D. ("Dr. Engelhardt," and

3   together with PETA, the "Next Friends"), submit this combined opposition to the motions to

4   dismiss of defendants David Slater ("Slater") and Wildlife Personalities, Ltd. ("Wildlife")

5   (Doc. No. 28) and Blurb Inc. ("Blurb") (Doc. No. 24) ("Defendants").

6   **I.        INTRODUCTION**

7        This case presents an issue of first impression:  Whether human authorship is required for

8   protection of works under the Copyright Act.  There is no dispute here that Naruto took the

9   photographs spontaneously and without human assistance.  In every practical (and definitional)

10  sense, he is the "author" of the works.  Defendants argue that animals have no standing under the

11  statute—that they cannot be "authors."  Yet none of the Defendants suggests that they have any

12  entitlement to ownership of the works.  Defendant Blurb implies that any work created by an

13  animal falls into the public domain; Defendant Slater does not argue here that he owns the

14  copyright.  These positions are both inconsistent with other statements made by Defendants and

15  wholly inconsistent with the premise of the Copyright Act—every copyright must have an author.

16  And both Blurb and Mr. Slater ignore the fundamental question posed here:  Does the Copyright

17  Act permit Plaintiff's ownership of the works or give him standing to assert claims under that

18  statute?  The answer to both questions is "Yes."

19       The text of the statute itself does not compel the conclusion that authorship may be vested

20  exclusively in humans.  To the contrary:  Since enacting the Copyright Act of 1790, Congress and

21  the Supreme Court have instructed that the copyright laws should be interpreted liberally in order

22  to safeguard the "general benefits derived by the public" from works of authorship.  *Sony Corp. of*

23  *Am. v. Universal City Studios*, 464 U.S. 417, 429 (1984).  Copyright protection advances that goal

24  by allowing authors to "disclose" their works without losing control of them.  *See Eldred v.*

25  *Ashcroft*, 537 U.S. 186, 190 (2003).

26       The question of authorship merely begs the standing question too summarily ignored by

27  Defendants.  It is not inconsistent with Article III of the Constitution to grant standing to animals.

28

1    *Cetacean Community v. Bush*, 386 F.3d 1169, 1176 (9th Cir. 2004).  The only question is whether

2    Naruto has standing under the Copyright Act.  He does.

3         Every copyright must have an "author."  If there is no author, there is no copyright.  *See* 17

4    U.S.C. § 102(a).  Furthermore, the Copyright Act explicitly grants standing to every author of an

5    original work.  *Id.* at §§ 201(a); 501(b).  Thus, if animals cannot be "authors," there is no

6    copyright protection for the works they create; and if they can be "authors," they have standing.

7         To be sure, as Professor Arthur R. Miller notes, "the fragments in the cases do not resolve

8    the question whether the Constitution requires human authorship" for protection under the

9    Copyright Act.  *See* Miller at 1065, *infra* at p. 14.  However, because copyright protection exists

10   primarily to advance society's interest in increasing creative output, it follows that the protection

11   under the Copyright Act does not depend on the humanity of the author, but on the originality of

12   the work itself.  While the circumstances presented here are novel, the issue is anything but

13   trivial—a point underscored by the "rivers of ink [that] are spilt" on whether computers can be

14   considered authors for copyright purposes. 1 Melville B. Nimmer & David Nimmer, NIMMER ON

15   COPYRIGHT § 5.01[A] (2015).  Whether works independently created by artificially intelligent

16   computers are entitled to copyright protection is, as Professor Nimmer notes, a question that may

17   soon demand an answer.  *Id*.  The answer to the question now before this court is therefore of

18   considerable moment.

19        The events preceding this litigation show that copyright protection is necessary, even for

20   animal-created works.  When Mr. Slater first shared Naruto's remarkable photographs with the

21   world, they quickly spread across the globe and all over the Internet.  Mr. Slater claimed that he

22   owned the copyrights, and threatened to sue the Wikimedia Foundation (and others) for

23   distributing the photographs.[1]  Wikimedia responded that no one owned the photographs,

24   reasoning that if animals are not "authors," then the photographs were in the public domain.  If

25

26       [1] An example of one of Slater's cease and desist letters, which is subject to judicial notice, was filed by Slater in an effort to obtain copyright registration in Guernsey.  *See* Plaintiff's

27   Request for Judicial Notice ("RJN"), Ex. A.  *See also* The Telegraph, "Wikipedia refuses to delete photo as 'monkey owns it'" (Aug. 6, 2014) (available at http://www.telegraph.co.uk/technology/

28   news/ 11015672/Wikipedia-refuses-to-delete-photo-as-monkey-owns-it.html) (RJN Ex. B).

5114200

1  that is the state of copyright law, animal-created works (or, for that matter, works created by

2  artificially intelligent computers) may never be protected.  That result is inconsistent with

3  Copyright Act's text, history, and purpose.

4      The Next Friends bring this lawsuit to determine whether Naruto is entitled to the rights

5  associated with the works he created.  Given the broad definition of that term and the clear

6  purpose of the Copyright Act, the answer is yes.  Defendants' motions should be denied.

7  **II.    STATEMENT OF RELEVANT FACTS**

8      Naruto is a free, autonomous seven-year old[2] crested macaque who lives on the island of

9  Sulawesi, Indonesia.  In or around 2011, Naruto found an unattended camera brought into

10  Naruto's habitat by Defendant Slater.  Using that camera, Naruto took a series of photographs of

11  himself (the "Monkey Selfies").  Compl. ¶ 1.  Naruto created the Monkey Selfies through a series

12  of purposeful and voluntary actions that were entirely unaided by Slater.  *Id.* at ¶ 2.

13      The Monkey Selfies quickly became internationally famous.  Seeking to capitalize on their

14  popularity, Defendants published and sold a book containing Naruto's Monkey Selfies, including

15  one on its cover.  *Id.* at ¶ 4.  In that book and elsewhere (though tellingly not in their motions to

16  dismiss), Defendants Slater and Wildlife claimed to own copyrights to the Monkey Selfies, even

17  as they admitted that Naruto created the photographs without human assistance.  *Id.*  For example,

18  in their book, they make these admissions in the course of describing the Monkey Selfies:

19      1.    "Sulawesi crested black macaque smiles at itself whilst pressing the shutter button on a

20          camera."  Compl. Ex. 2.

21      2.    "A Sulawesi crested black macaque pulls one of several funny faces during its own

22          photo shoot, seemingly aware of its own reflection in the lens.  Despite the howling

23          posture, the macaque was silent throughout, suggesting to me some form of fun and

24          artistic experiment with its own appearance."  *Id.* at Ex. 3.

25      3.    "Posing to take its own photograph, unworried by its own reflection, smiling.  Surely a

26          sign of self-awareness?"  *Id.* at Ex. 4.

27

28      [2] The complaint alleges Naruto is six years old.  However, he turned seven on November 23, 2015, after the complaint was filed.

4.    "[T]he shutter was pressed by the monkey." *Id.* at Ex. 4.

5.    "'My experience of these monkeys [crested macaques] suggested that they were not just highly intelligent but were also aware of themselves. . . . It was only a matter of time before one pressed the shutter resulting in a photo of herself [sic]. She [sic] stared at herself with a new found appreciation, and made funny faces – in silence – just as we do when looking in a mirror. She [sic] also, importantly, made relaxed eye contact with herself [sic], even smiling….She [sic] was certainly excited at her [sic] own appearance and seemed to know it was herself [sic].'" *Id.* at Ex. 4.

Though he is a free animal, Naruto is not unknown to humans. Naruto is part of a small population of Sulawesi crested macaques who have been studied for nearly a decade by Dr. Engelhardt, a German primatologist and ethologist. Compl. ¶ 19. Since 2006, Dr. Engelhardt has served as the co-head of one of the foremost scientific projects studying the ecology, reproductive biology, and social systems of Naruto and his kin, as well as promoting their conservation and protection. Dr. Engelhardt is one of the world's foremost experts on the *Macaca nigra* species to which Naruto belongs. *Id.* at ¶ 20. Dr. Engelhardt and those with whom she works have known, monitored, and studied Naruto since his birth. *Id.* at ¶ 21. Based upon their personal knowledge of Naruto, she and her team were able to recognize Naruto as both the author and subject of the Monkey Selfies.

The Next Friends share a commitment and dedication to Naruto and the preservation of both his habitat and his rights. These are not concepts foreign to U.S. law. *See* Chimpanzee Health Improvement, Maintenance, and Protection Act, Pub. L. No. 106-551, 114 Stat. 2752 (codified at 42 U.S.C. § 287a-3a). Pursuant to that commitment, the Next Friends filed this lawsuit on Naruto's behalf, pursuant to Rule 17(c) of the Federal Rules of Civil Procedure, in which they seek relief under the Copyright Act from the Defendants' ongoing infringement of Naruto's rights.

## III.    LEGAL STANDARD

On a motion to dismiss, "[a]ll factual allegations set forth in the complaint 'are taken as true and construed in the light most favorable to plaintiffs.'" *Lee v. City of Los Angeles*, 250 F.3d

1   668, 679 (9th Cir. 2001) (quoting *Epstein v. Washington Energy Co.*, 83 F.3d 1136, 1140 (9th Cir.

2   1996)).  When assessing a challenge to the standing of the plaintiff, "the court must be careful not

3   to decide the questions on the merits for or against plaintiff, and must therefore assume that on the

4   merits the plaintiffs would be successful in their claims."  *Defenders of Wildlife v. Gutierrez*, 532

5   F.3d 913, 924 (D.C. Cir. 2008).  Where, as here, a complaint raises novel legal questions, the

6   Court "should be especially reluctant to dismiss on the basis of the pleadings."  *McGary v. City of*

7   *Portland*, 386 F.3d 1259, 1270 (9th Cir. 2004) (citing *Elec. Constr. & Maint. Co., Inc. v. Maeda*

8   *Pac. Corp.*, 764 F.2d 619, 623 (9th Cir. 1985)).

9   **IV.    ARGUMENT**

10                  **A.    Animals Have Standing To Sue Under The Copyright Act**

11          Article III of the Constitution authorizes Congress to give animals standing to sue in

12   federal court, just as Congress may grant standing to other non-human litigants, including

13   "corporations, partnerships or trusts, and even ships."  *Cetacean Community*, 386 F.3d at 1176;

14   *see also Okinawa Dugong v. Gates*, 543 F. Supp. 2d 1082, 1093 (N.D. Cal. 2008) ("Article III

15   does not prevent Congress from authorizing suits in the name of an animal").  The only question is

16   "whether Congress has passed a statute actually doing so."  *Id.*

17          The Next Friends bring this lawsuit on behalf of Naruto pursuant to the Copyright Act, 17

18   U.S.C. § 101 *et seq.*, which grants standing to anyone, including Naruto, who creates an "original

19   work of authorship."

20          "The starting point in discerning congressional intent is the existing statutory text."  *Lamie*

21   *v. U.S. Trustee*, 540 U.S. 526, 534 (2004).  The Copyright Act applies to "original works of

22   authorship fixed in a tangible medium of expression, now or later developed . . . ."  17 U.S.C.

23   § 102(a).  The Act specifies who has standing to sue:  "The legal or beneficial ***owner*** of an

24   exclusive right under a copyright is entitled . . . to institute an action for any infringement . . . ."

25   *Id.* § 501(b) (emphasis added).  Thus, standing is available to any copyright "owner."  *See Silvers*

26   *v. Sony Pictures Entertainment, Inc.*, 402 F.3d 881, 884 (9th Cir. 2005) ("The meaning of that

27   provision appears clear.  To be entitled to sue for copyright infringement, the plaintiff must be the

28   'legal or beneficial owner of an exclusive right under a copyright.'"); *John Wiley & Sons, Inc. v.*

- 5 -

1  *DRK Photo,* 998 F. Supp. 2d 262, 276 (S.D.N.Y. 2014) ("Section 501(b) of the Copyright Act

2  establishes who may sue for infringement of a copyright.").

3       The Copyright Act also defines "owner," at least initially:  "Copyright in a work protected

4  under this title vests initially in the ***author*** or ***authors*** of the work."  *Id.* at § 201(a) (emphasis

5  added).  Thus, to be an "owner" and, by extension, to have standing, the plaintiff need only allege

6  to be the "author" of a disputed work.  *See Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730,

7  737 (1989) ("The Copyright Act of 1976 provides that copyright ownership 'vests initially in the

8  author or authors of the work.'"); *DC Comics v. Towle*, 802 F.3d 1012, 1024 (9th Cir. 2015)

9  ("Accordingly, the ***author*** of an underlying work is entitled to sue a third party who makes an

10 unauthorized copy . . . .") (emphasis added).

11      Congress chose not to define "author" in the Copyright Act.  Instead, Congress borrowed

12 that term from the Constitution itself, which authorizes Congress to protect the "Writings" of

13 "Authors."  *Goldstein v. California*, 412 U.S. 546, 561 (1973) (citing Const. Art. I, § 8).  Long

14 before the Copyright Act of 1976, the Supreme Court interpreted the constitutional meaning of

15 "author" in its broadest possible sense:  "While an 'author' may be viewed as an individual who

16 writes an original composition, the term, in its constitutional sense, has been construed to mean an

17 'originator,' 'he to whom anything owes its origin.'"  *Goldstein*, 412 U.S. at 561 (quoting *Burrow-*

18 *Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 58 (1884)).  "As a general rule, the author is the

19 party who actually creates the work, that is, the person who translates an idea into a fixed, tangible

20 expression entitled to copyright protection."  *Cmty. for Creative Non-Violence,* 490 U.S. at 737;

21 *see also U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*, 692 F.3d 1009, 1015 (9th Cir. 2012)

22 ("Under § 201(a) of the Copyright Act, copyright ownership 'vests initially in the author or

23 authors of the work,' which is generally the creator of the copyrighted work.").

24      In the case of a photograph, the author is typically "the person who sets it up and snaps the

25 shutter."  *Aalmuhammed v. Lee*, 202 F.3d 1227, 1232 (9th Cir. 2000).  Over a century ago, in

26 *Burrow-Giles Lithographic*, the Supreme Court considered whether the "author" was the

27 individual who physically took the picture or the individual who made an image out of the

28 negative.  To answer this question, the Court articulated its standard that an author is "he to whom

1    anything owes its origin."  111 U.S. at 58.  Applying that standard to a photograph, the Court

2    concluded that the author is "'the person who effectively is as near as he can be the cause of the

3    picture which is produced.'"  *Burrow-Giles Lithographic*, 111 U.S. at 61 (quoting *Nottage v.*

4    *Jackson*, 11 Q.B.D. 627 (1883)).

5         Here, Naruto has sufficiently alleged that he is the author of the Monkey Selfies.  Naruto

6    alleges, and Slater admits, that Naruto was responsible for creating the Monkey Selfies.

7    Compl. ¶ 1–2.  Naruto further alleges that no human intended to, or did in fact, assist in creating

8    the Monkey Selfies.  *Id.*  Thus, Naruto has sufficiently alleged that he is the author of the Monkey

9    Selfies—i.e., that he is their "originator," the one "to whom" the photographs owe their "origin."

10   Naruto is not required to allege anything else to have standing in this Court.

11        **B.     "Authorship" Under The Copyright Act Does Not Exclude Animals**

12        As Slater recognizes in his motion, there is nothing unreasonable about granting standing

13   to animals:  "To be sure, there are quite reasonable arguments for conferring legal standing for

14   animals (via human *ad litem* representatives) in some areas of law…"  (Doc No. 3:8-9.)  In other

15   words, the fact that a monkey is seeking relief is not *per se* a reason to throw out this suit, as Slater

16   acknowledges.  And yet, none of the Defendants marshal a compelling argument that the

17   circumstances and context of the Copyright Act mandate a finding that animals are excluded as a

18   matter of law from being recognized as "authors."  To the contrary, because the Copyright Act

19   does not define "author," the statute neither includes nor excludes animals—or, indeed,

20   corporations and other non-human persons—from its definition.

21        Defendants incorrectly argue that the result of *Cetacean* should control here.  However,

22   that case involved a different statute, and as such is distinguishable.  *Cetacean* did not hold that

23   animals lack standing to sue in federal court.  Rather, *Cetacean* held that standing depends on

24   whether the statute under which the case is brought gives animals standing.  In *Cetacean*, the

25   Ninth Circuit considered whether animals can sue the United States under the Administrative

26   Procedures Act to enforce the provisions of the Endangered Species Act.  386 F.3d at 1176.  After

27

28

1    recognizing that nothing under Article III of the Constitution prevents animals from having

2    standing to sue, the court concluded that the plain text of *those specific statutes* do not grant

3    animals standing, because both statutes explicitly limited the definition of a "person" with

4    standing to only include "'an individual, partnership, corporation, association, or public or private

5    organization other than an agency.'" *Id.* at 1178 (quoting 5 U.S.C. §§ 551(2), 701(b)(2)).

6         In contrast, the Copyright Act has no definitional limitation.  In drafting the Copyright Act,

7    Congress intentionally chose not to define "author" but instead adopted the broad judicial

8    definition that had been in place since at least the 19th century.  *See* H. Rep. No. 1476, 94th

9    Cong., 2d Sess. 51 (1976), reprinted in *Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 909

10   n.7 (2d Cir. 1980) ("The phrase 'original works of authorship,' which is purposely left undefined,

11   is intended to incorporate without change the standard of originality established by the courts

12   under the present copyright statute.").  Defendants point out that the Copyright Act does not

13   *expressly* grant standing to animals.  But Congress did not provide any express definition at all.

14   That definition was already in place, and it had been stated in the broadest terms.

15        Moreover, the Copyright Act expressly provides that not all authors will be human.  For

16   example, the Copyright Act provides that if a work is created by an employee, then "the employer

17   . . . is considered the author."  17 U.S.C. § 201(b).  Under this statute, the title "author" does not

18   begin with the creator and then pass to the employer; rather, the rights of authorship vests initially

19   with the employer itself.  *See Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1145 (9th

20   Cir. 2003) ("[T]he Act does not envision a work-for-hire arrangement as an "assignment," but

21   rather provides for *initial vesting* of all rights of authorship in the person for whom the work was

22   prepared.") (emphasis in original).  Thus, in instances where the employer is a corporation, the

23   corporate employer is the author under the statute.  *See Playboy Enterprises Inc. v. Dumas*, 53

24   F.3d 549, 565 (2d Cir. 1995) ("Playboy is the 'author' of those works and owns their copyrights");

25   *Imperial Toy Corp. v. Goffa Int'l Corp.*, 988 F. Supp. 617, 620 (E.D.N.Y. 1997) (Chinese entity

26   was an "author" under Copyright Act because statute does not distinguish based on "the

27   nationality of the author of the work").

28

The Copyright Act specifically defines the duration of copyright protection for "anonymous works," 17 U.S.C. § 302(c), *i.e.*, works for which "no **natural person** is identified as author." 17 U.S.C. § 101 (emphasis added). Such anonymous works may be registered without ever revealing the author's identity. *See* 17 U.S.C. § 409(3). Thus, Congress explicitly bestowed copyrights even where the author is not identified, leaving no statutory impediment for a human to register an anonymous work on behalf of an animal author. *See id.* Indeed, there is no reason to doubt that the Copyright Office would have registered the Monkey Selfies if they had been presented as the work of an anonymous author, or by its Next Friends.

In allowing both corporate authors and anonymous authors, the Copyright Act stands in stark contrast to how Congress decided to provide for other intellectual property rights, such as patents. Under the Patent Act, the "inventor"—*i.e.*, patent law's equivalent of a copyright "author"—specifically excludes corporations and other non-natural persons. *See* 35 U.S.C. § 100(f) ("The term 'inventor' means the individual . . . who invented or discovered the subject matter of the invention."); *id.* § 111(a) (only the "inventor" may submit a patent application). Thus, if Congress wanted to exclude non-human authorship rights, it knew how to do so and would have enacted parallel features into the Copyright Act.

The legislative history of the Copyright Act of 1976 supports the conclusion that animals may be authors. Just because no prior case has sought (and no court has previously granted) copyright protection on behalf of the animal is hardly dispositive, as Defendants erroneously argue. Members of Congress explicitly noted that the history of copyright law "has been one of gradual expansion in the types of works accorded protection." *See* Notes of Committee on the Judiciary, H. Rep. No. 94-1476, 51, 1976 U.S.C.C.A.N. 5659, 5664. "Authors are continually finding new ways of expressing themselves, but it is impossible to foresee the forms that these new expressive methods will take." *Id.* Congress enshrined this principle into the Copyright Act itself, explicitly including protections for "original works of authorship fixed in a tangible medium of expression, **now or later developed** . . . ." 17 U.S.C. § 102(a) (emphasis added). That historical context and legislative intent is a "critical tool of . . . interpretation" to "determine the public

1    understanding of a legal text in the period after its enactment."  *D.C. v. Heller*, 554 U.S. 570, 605

2    (2008).

3         Defendants also argue that the Copyright Act employs "human" terms by providing for the

4    transfer of copyrights to the "children" and the "widow or widower" of an author.  *See* 17 U.S.C.

5    §§ 101, 203, and 304.  Providing for the inheritance rights of authors falls well short of an

6    inference restricting standing to humans only.  For example, identifying the widow or children of

7    an anonymous author would be as difficult as it would be for Naruto.  By recognizing that

8    corporations can be authors, the Copyright Act makes it clear that neither marriage, procreation,

9    nor even being human is a precondition for standing.  No one would argue that an unmarried,

10   childless human cannot be an "author," even though that human would—like Naruto—never leave

11   behind a "widow or widower."  Defendants further ask the Court to speculate as to how the rights

12   of an animal author are inherited under the statute.  But none of those questions is currently before

13   the Court.  *PDK Labs., Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in

14   part and concurring in the judgment) (noting the "cardinal principle of judicial restraint":  "if it is

15   not necessary to decide more, it is necessary not to decide more").  The sole question is whether

16   Naruto fits the definition of "author."  He does.

17        **C.    The Copyright Act Must Be Interpreted Broadly**

18        The Supreme Court emphasizes that the Copyright Act must be interpreted broadly to

19   achieve the purpose on which it is based.  The purpose of the Copyright Act is written in the

20   Constitution itself, which instructs Congress to pass laws to "promote" the "Arts" by protecting

21   the "Writings" of "Authors."  Const. Art. I, Sec. 8; *see also Goldstein*, 412 U.S. at 561.

22        To accomplish this end, Congress and the Supreme Court have interpreted the terms

23   "Writings" and "Authors" as broadly as possible.  "These terms have not been construed in their

24   narrow literal sense but, rather, with the reach necessary to reflect the broad scope of

25   constitutional principles."  *Id.*  Thus, after its invention, the Supreme Court had no doubt that

26   photographs were "Writings," even if not actually written, because "Writings" is "susceptible of a

27   more enlarged definition."  *Burrow-Giles Lithographic*, 111 U.S. at 58.  "The only reason why

28   photographs were not included in the extended list in the act of 1802 is, probably, that they did not

5114200                                    PLAINTIFF'S OPPOSITION TO MOTIONS TO DISMISS

1   exist, as photography, as an art, was then unknown." *Id.* Failing to recognize animals as

2   "authors"—even if animal-created art was "unknown" until recent times—would impermissibly

3   curtail the broad scope of the Copyright Act and prevent it from reaching its constitutionally

4   mandated goals.

5         Defendant Blurb argues that Naruto cannot be an author, because Naruto "cannot arrange

6   for public display of a photograph, advertise it for sale, have it reproduced, negotiate a license

7   agreement, or sell it at a gallery, at auction or on the Internet." (Doc. No. 6 at 12-13.) These facts

8   are irrelevant to the definition of "author" under the Copyright Act. Human children—and even

9   certain incapacitated adults—can do none of those things, but they are still "authors" under the

10  Copyright Act. *See generally* Notes of Committee on the Judiciary, H. Rep. No. 94-1476, 126

11  (referencing "the legally appointed guardians or committees of persons incompetent to sign

12  because of age or mental disability"); *Mason v. Jamie Music Pub. Co.*, 658 F. Supp. 2d 571 (2009)

13  (addressing copyright to song lyrics written by a minor). Because children cannot assert their

14  rights without the help of others, they are permitted, as here, to present their case through another

15  party acting on their behalf. *See* Fed. R. Civ. P. 17(c).

16        Defendant Blurb also cynically asks, "What does a monkey care if its photograph is

17  displayed or used or sold?" (Doc. No. 24 at 6:19-20.) That question misses the point. The

18  purpose of the Copyright Act is to protect the "general benefits derived by the public from the

19  labors of authors." *Sony Corp. of Am.*, 464 U.S. at 429. Congress promotes those "general

20  benefits" by granting copyright protection "to induce release to the public of the products of [the

21  author's] creative genius." *United States v. Paramount Pictures*, 334 U.S. 131, 158 (1948); *see

22  also Eldred*, 537 U.S. at 190 ("[D]isclosure is the desired objective of the author seeking copyright

23  protection."). "The monopoly created by copyright thus rewards the individual author in order to

24  benefit the public." *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 546

25  (1985).

26        If animals cannot be authors, there is no copyright protection for their works. 17 U.S.C.

27  §§ 102(a), 201(a). The Copyright Act only applies to "original works of ***authorship*** fixed in a

28  tangible medium." *Id.* at § 102(a) (emphasis added). Moreover, "[t]hat fixation must be done 'by

or under the authority of the author.'"  *Garcia v. Google, Inc.*, 786 F.3d 733, 741 (9th Cir. 2015)

(quoting 17 U.S.C. § 101).  Without an author, there can be no "fixation," no "work of

authorship," and thus, no copyright.  *Id.*; *see also Cmty. for Creative Non-Violence,* 490 U.S. at

737 ("As a general rule, the author is the party . . . who translates an idea into a fixed, tangible

expression entitled to copyright protection.").  Thus, if an animal cannot be an "author," then any

work which "owes its origin" to an animal will not have copyright protection.  *See Garcia*, 786

F.3d at 741; *see also Burrow-Giles Lithographic*, 111 U.S. at 58.

Such a result is antithetical to the public interest, and hence, the intent of the drafters of the

Copyright Act.  There is no doubt that the general public has a tremendous interest in animal art,

which is why Defendants seek to profit from the photographs (and to bar others from doing so),

while ignoring the question as to whether they have any claim of ownership.  To turn Defendant

Blurb's question on itself, it is quite obvious why it (and Mr. Slater) care if the photograph is

displayed or used or sold, and why they seek to avoid the consequences of profiting from works

that they cannot claim to own, and which they do ***not*** claim to own in response to this suit.

But even if Defendants do not claim a right to the Monkey Selfies, leaving the images to

the public domain—as insinuated by Blurb—is fundamentally at odds with the Copyright Act.

The statute itself makes it clear that "[c]opyright protection extends to ***all*** 'original works of

authorship fixed in any tangible medium' of expression."  *Action Tapes, Inc. v. Mattson*, 462 F.3d

1010, 1013 (8th Cir. 2006) (emphasis added); *see also Bell Atl. Bus. Sys. Servs., Inc. v. Hitachi

Data Sys. Corp.*, No. C 93-20079 JW, 1995 WL 836331, at *3 (N.D. Cal. Dec. 14, 1995)

("Copyright protection extends to ***all*** original works of authorship fixed in any tangible medium of

expression") (emphasis added).  The only requirement is that the work must be original.  *See* § 17

U.S.C. § 102(a).  There is no reason to add a judicially-created exception to the Copyright Act's

broad scope that carves out animal-created works.  The historical antecedents of such an

ownership lacuna cannot be the intended result.[3]

---

[3] For example, before the Civil War, the U.S. Patent Office held that inventions by slaves could
not be patented by anyone because slaves could not own property and slaveholders were not the
inventors.  *See* Aoki, "Distributive and Syncretic Motives in Intellectual Property Law (with
Special Reference to Coercion, Agency, and Development)," 40 U.C. DAVIS L. REV. 717, 801

1    At this stage of the proceeding, the sole question is whether Naruto is an "author" within

2  the meaning of 17 U.S.C. § 201(a).  Given the plain reading of the statute, the purposes for which

3  the Copyright Act was created, and Defendants' own acknowledgment that copyright protection is

4  necessary under the circumstances, that question should be answered in the affirmative.

5    **D.    No Authority Has Addressed Animal Authorship**

6    The fact that a right has not been previously asserted does not mean that it cannot be

7  asserted:  "If rights were defined by who exercised them in the past, then received practices could

8  serve as their own continued justification and new groups could not invoke rights once denied."

9  *Obergefell v. Hodges*, 135 S.Ct. 2584, 2602 (2015).

10    Defendants cite cases that, unsurprisingly, discuss copyright in human terms, such as

11  referring to an author as a "man."  As the Supreme Court recognized when it first considered

12  whether the "new" technology of photography was a "Writing," those who came before us used

13  the language they did because photography (like animal-created art) "was then unknown."

14  *Burrow-Giles Lithographic*, 111 U.S. at 58.  Importantly, none of the cases Defendants cite

15  considered the possibility of an animal author.  Thus, any reference to authors as "humans" is

16  dicta; nor does it indicate how those courts would rule if presented with the question at issue here.

17  *Cetacean*, 386 F.3d at 1173 ("A statement is dictum when it is 'made during the course of

18  delivering a judicial opinion, but ... is unnecessary to the decision in the case and is therefore not

19  precedential.'") (quoting *Best Life Assur. Co. v. Comm'r*, 281 F.3d 828, 834 (9th Cir. 2002)).

20    Indeed, the only time that the Ninth Circuit has ever considered the possibility of a non-

21  human author, the court expressly declined to answer the question:

22    The copyright laws, of course, do not expressly require "human" authorship, and
    considerable controversy has arisen in recent years over the copyrightability of
23    computer-generated works.  We agree with [the appellee] however, that it is not
    creations of divine beings that the copyright laws were intended to protect, and that
24    in this case some element of human creativity must have occurred in order for the
    Book to be copyrightable.  At the very least, for a worldly entity to be guilty of
25    infringing a copyright, that entity must have copied something created by another
    worldly entity.
26

27

28  (2007) (citing Yancy, "Four Black Inventors with Patents," 39 Negro Hist. Bull. 574, 574
    (1976)).

- 13 -

1   *Urantia Foundation v. Maaherra*, 114 F.3d 955, 958 (9th Cir. 1997) (citing Arthur R. Miller,

2   "Copyright Protection for Computer Programs, Databases, and Computer–Generated Works: Is

3   Anything New Since CONTU?," 106 HARV. L. REV. 977 (1993)).

4        Defendants cite *Urantia Foundation* simply because the court stated that the divine works

5   of celestial beings are only copyrightable by the "first human beings" who record their works.  *Id.*

6   But the Ninth Circuit did *not* hold that only humans could be authors.  The court merely observed

7   that authorship by celestial beings cannot be proven, and that even celestially inspired words need

8   "worldly" hands to record them.  *Id.*  However, unlike heavenly revelations that require human

9   hands to write them, human hands are not required to take a photograph.  Thus, insofar as the issue

10  of non-human authorship has been considered by the Ninth Circuit, it remains an open question.

11  The only requirement articulated by the court so far is that the "author" be of this world.  *See id.*

12       Finally, Defendants cite the *Compendium of the U.S. Copyright Office Practices, Third*

13  *Edition* (Dec. 22, 2014).  The *Compendium* states that human authorship is a requirement for

14  registering a copyright with the U.S. Copyright Office.  However, because the Monkey Selfies are

15  foreign works, they do not require registration with the Copyright Office.  *See* 17 U.S.C. §§ 101

16  and 411(a).

17       Moreover, the *Compendium* does not explain how it reaches the conclusion that animal-

18  created works cannot be registered.  It cites only two cases.  *See Compendium* § 306.  First, it cites

19  *Trade-Mark Cases*, 100 U.S. 82, 94 (1879), which held that copyright law protects "the fruits of

20  intellectual labor" that "are founded in the creative powers of the mind."  Second, it cites *Burrow-*

21  *Giles Lithographic*, which held that copyright law is limited to "original intellectual conceptions

22  of the author."  111 U.S. at 58.

23       Neither case held, or even considered, whether a human mind is necessary for copyright

24  protection.  Rather, these cases were addressing the requirement that copyrightable works must be

25  "original."  *See id.*  The Monkey Selfies easily meet that requirement, as the threshold for

26  originality is minimal:  "Originality in this context means little more than a prohibition of actual

27  copying."  *North Coast Indus. v. Jason Maxwell, Inc.*, 972 F.2d 1031, 1033 (9th Cir. 1992).  There

28  is no suggestion that Naruto's photographs were copied from any third party.  They are original—

5114200

1    otherwise they never would have become so popular.  Thus, by concluding that animal-created

2    works cannot be registered, the *Compendium* not only failed to provide supporting analysis, it also

3    reached the wrong conclusion, which in any event is not binding on this Court.

4            Moreover, federal courts have suggested for over a century that every photograph will—by

5    its very nature—be sufficiently original because no two photographs will ever be exactly the same.

6    In *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239 (1903), the Supreme Court held that

7    chromolithographs, which depict real scenes and people as photographs do, were copyrightable

8    because they were "the personal reaction of an individual upon nature.  Personality always

9    contains something unique."  *Id.* at 250.  Building on *Bleistein*, Judge Learned Hand considered it

10   likely that every photograph would be copyrightable because "no photograph, however simple,

11   can be unaffected by the personal influence of the author, and no two will be absolutely alike."

12   *Jewelers' Circular Pub. Co. v. Keystone Pub. Co.*, 274 F. 932, 934 (2d Cir. 1921).  More recently,

13   the Ninth Circuit observed that Judge Hand's comment "has become the prevailing view" of

14   modern copyright law, leaving it likely that "all photographs are sufficiently original by their

15   nature to merit copyright protection."  *Los Angeles News Service v. Tullo*, 973 F.2d 791, 793

16   (1992); *see also Ets–Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1074 (9th Cir. 2000) ("Indeed, the

17   idea that photography is art deserving [copyright] protection reflects a longstanding view of

18   Anglo–American law.").

19           Thus, while it may seem unusual to grant a monkey a copyright to a photograph, not doing

20   so would itself depart from well-established norms.  *See Ets-Hokin*, 225 F.3d at 1073 (holding that

21   photos of vodka bottles were protected by copyright given "the low threshold for originality under

22   the Copyright Act, as well as the longstanding and consistent body of case law holding that

23   photographs generally satisfy this minimal standard"); *see also Bleistein*, 188 U.S. at 250 ("The

24   least pretentious picture has more originality in it than directories and the like, which may be

25   copyrighted.")

26           This Court is not bound by the *Compendium*.  The *Compendium* itself acknowledges that it

27   "does not override any existing statute or regulation.  The policies and practices set forth in the

28   *Compendium* do not in themselves have the force and effect of law and are not binding upon the

- 15 -

1  Register of Copyrights or U.S. Copyright Office staff." *Compendium* at p. 2.  Furthermore, "the

2  Copyright Office has no authority to give opinions or define legal terms and its interpretation on

3  an issue never before decided should not be given controlling weight." *Bartok v. Boosey &*

4  *Hawkes, Inc.,* 523 F.2d 941, 946–47 (2d Cir. 1975) (citing *DeSylva v. Ballentine*, 351 U.S. 570,

5  577-78 (1956)).

6          The Supreme Court has held that lower courts may consider the interpretations set forth in

7  administrative manuals, such as the *Compendium*, only to the extent that such documents "have

8  the power to persuade." *Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (internal

9  citations omitted).  "The weight of [the agency's] judgment in a particular case will depend upon

10  the thoroughness evident in its consideration, the validity of its reasoning, its consistency with

11  earlier and later pronouncements, and all those factors which give it power to persuade . . . ."

12  *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *see also United States v. Mead Corp*., 533

13  U.S. 218, 228 (2001) (stating that deference to agency opinion varies with "the degree of the

14  agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the

15  agency's position").

16          Here, it is evident that the drafters of the *Compendium* gave the question of animal

17  authorship little consideration and no reasoned explanation to support their conclusions.  Indeed,

18  the only legal test referenced by the *Compendium* is that works must be "original."  Yet there is no

19  doubt the Monkey Selfies are original.  Because the *Compendium* fails to explain how it reached

20  its conclusion, it is not entitled to any weight.  *See, e.g., Boyds Collection, Ltd. v. Bearington*

21  *Collection, Inc.*, 360 F. Supp. 2d 655, 661-62 (M.D. Penn. 2005) (holding that because letters

22  from the Copyright Office did not indicate the source of the interpretation or the manner in which

23  it was reached, and did not include a rationale or explanation for the agency's construction of the

24  statute, "their value as persuasive authority, and the deference owed to the agency's interpretation,

25  is thus substantially limited").

26          Moreover, the *Compendium*'s conclusion is inconsistent with the plain language of the

27  Copyright Act, the breadth with which it is interpreted, and the constitutional purposes for which it

28

5114200

1   was enacted.  For these reasons, the Copyright Office's refusal to register animal-created works

2   "should not be given controlling weight," *Bartok*, 523 F.2d at 946–47, if any weight at all.

3       **E.       The Complaint Alleges A Concrete, Redressable Injury**

4           In addition to standing under the Copyright Act, Naruto satisfies the constitutional

5   requirements for standing, which require a redressable "injury in fact."  *See Lujan v. Defs. of*

6   *Wildlife*, 504 U.S. 555, 560 (1992).

7           The Copyright Act itself identifies the injury necessary to bring a claim:  there must be an

8   "infringement" of "an exclusive right under a copyright."  17 U.S.C. § 501(b).  Those exclusive

9   rights are also listed in the statute.  *See* 17 U.S.C. § 106; *see also Perfect 10, Inc. v. Amazon, Inc.*,

10  508 F.3d 1146, 1159 (9th Cir. 2007) (plaintiffs "must demonstrate that the alleged infringers

11  violate at least one exclusive right granted to copyright holders under 17 U.S.C. § 106").

12          Here, Naruto alleges that Defendants "displayed, advertised, reproduced, distributed,

13  offered for sale, and sold copies of the Monkey Selfies." Compl. ¶ 43.  For example, Naruto

14  alleges that Defendants are reproducing the Monkey Selfies in a book that the Defendants are

15  offering for sale at present.  *See id.* at ¶ 4.  All of this conduct violates Naruto's exclusive right to

16  "reproduce the copyrighted work."  17 U.S.C. § 106(1).  Thus, Naruto alleges an "injury in fact."

17          Likewise, that injury is redressable.  Again, the Copyright Act specifically identifies the

18  remedies that are available, including injunctive relief (§ 502), monetary damages (§ 504), and

19  costs and attorney's fees (§ 505); *see Sony Corp.*, 464 U.S. at 430 ("The remedies for infringement

20  are only those prescribed by Congress.").  Each of these remedies is requested in the complaint's

21  prayer for relief.  *See* Compl. at pp. 9–10.

22          Defendants incorrectly argue that Naruto cannot be injured because Naruto on his own

23  would never have published the photographs.  Standing under the Copyright Act does not require

24  that the author intend to publish the work himself.  *See Monge v. Maya Magazines, Inc.*, 688 F.3d

25  1164, 1178 (9th Cir. 2012) ("'It may seem paradoxical to allow copyright to be obtained in secret

26  documents, but it is not.  Federal copyright is now available for unpublished works that the author

27  intends to never see the light of day.'") (quoting *Chicago Bd. of Educ. v . Substance, Inc.*, 354

28  F.3d 624, 627 (7th Cir. 2003)) (internal alterations omitted); *Worldwide Church of God v.*

1    *Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1115 (9th Cir. 2000) ("Even an author who had

2    disavowed any intention to publish his work during his lifetime was entitled to protection of his

3    copyright.").  Nor does standing require an author to derive any monetary gain from his work.

4    *Worldwide Church of God*, 227 F.3d at 1115 ("That right is not diminished or qualified by the fact

5    that [appellant] is a not-for-profit organization and does not realize monetary benefit from the use

6    of the copyrighted work.").  Thus, in *Monge*, the Ninth Circuit held that copyright protection

7    extended to wedding photographs that were taken solely "for the couple's private use," even

8    though the photographs would have never been published or earned a single dollar but for the

9    infringing party.  *Id.*

10           **F.      This Court Should Not Rule On The Merits**

11           Defendants impermissibly ask the Court to rule on the merits of this case by considering

12    evidence outside the scope of the pleadings.

13           First, Defendants suggest that the complaint should be dismissed because there is no

14    evidence that Naruto is the monkey who took the photograph.  That argument is both incorrect and

15    premature.  On a motion to dismiss, the Court must "accept all allegations of fact in the complaint

16    as true and construe them in the light most favorable to the plaintiffs."  *Warren*, 328 F.3d at 1139.

17    Similarly, when reviewing whether a plaintiff has standing, the court must assume that on the

18    merits the plaintiff would succeed on those claims.  *Defenders of Wildlife v. Gutierrez*, 532 F.3d

19    913, 924 (D.C. Cir. 2008).

20           Here, the complaint alleges that Naruto is the individual who took the Monkey Selfies

21    "using a camera left unattended by defendant David John Slater" that "resulted from a series of

22    purposeful and voluntary actions by Naruto, unaided by Slater, resulting in original works of

23    authorship not by Slater, but by Naruto."  Compl. ¶¶  1–2.

24           Defendants self-servingly point to portions of the book that they themselves published,

25    which is quoted in the complaint, where Slater incorrectly describes Naruto as "female."

26    Defendants argue this "contradiction" alleviates the deference the Court must give the allegations

27    of the complaint:  an odd circumlocution of the pleading standards, given that Defendants seek to

28    use *their* inability to correctly identify the gender of Naruto as a basis to deny him any relief.  (In

- 18 -

1   each instance where Slater is quoted, the complaint indicates that Slater's use of the female

2   pronoun was incorrect by including in the quotation the modifier "[sic]".  Compl. ¶ 7.)

3          Moreover, there is no doubt that, as stated in the complaint, Naruto is the macaque in the

4   Monkey Selfies.  For nearly a decade, Naruto's next friend Dr. Engelhardt and her team have

5   closely studied Naruto and his kin in their natural habitat.  "Naruto and his matrilineal family are

6   an integral part of the crested macaque population Dr. Engelhardt studies."  Compl. ¶ 4.  In the

7   course of that work, "Dr. Engelhardt and those with whom she works have known, monitored, and

8   studied Naruto since his birth."  *Id.*  Accepting these allegations as true, the Court must assume

9   that Naruto is the macaque in the photograph.

10          Second, Blurb asks the Court to rule on the merits of the case to determine whether, as a

11   result of Blurb's alleged terms of service, Blurb can be held liable for infringement.  Blurb's terms

12   of service and the purported truth of the matter stated therein are not alleged anywhere in the

13   complaint and are not the proper subject of judicial notice.  *See United States v. Kane*, 2013 WL

14   5797619, at *9 (D. Nev. Oct. 28, 2013) ("When a court takes judicial notice of publications like

15   websites and newspaper articles, the court merely notices what was in the public realm at the time,

16   not whether the contents of those articles were in fact true.")  To the contrary, the complaint

17   alleges that "Slater and Defendant Blurb . . . published and sold for profit a book in the United

18   States containing copies of the Monkey Selfies."  Compl. ¶ 4.  That allegation alone, if proven, is

19   sufficient to hold Blurb legally responsible for copyright infringement.  *See* 17 U.S.C. §§ 106(1);

20   501(b); *Perfect 10*, 508 F.3d at 1159.  Thus, Naruto properly states a claim against Blurb.

21          The Court "should be especially reluctant to dismiss on the basis of the pleadings when the

22   asserted theory of liability is novel or extreme, since it is important that new legal theories be

23   explored and assayed in the light of actual facts rather than a pleader's suppositions.'"  *McGary v.*

24   *City of Portland*, 386 F.3d 1259, 1270 (9th Cir. 2004) (quoting *Elec. Constr. & Maint. Co., Inc. v.*

25   *Maeda Pac. Corp.*, 764 F.2d 619, 623 (9th Cir.1985)).  "This is in part because further facts may

26   make it unnecessary to decide the hard case but also because the facts are likely to contribute to a

27   more sensitive assessment of what the law 'is' (which, absent decisive precedent, means what it

28   'should be')."  *Doe v. Walker*, 193 F.3d 42, 46 (1st Cir. 1999); *see also Thomas v. New York City*,

814 F. Supp. 1139, 1152 (E.D.N.Y. 1993) ("In light of the novelty of this claim and the fact that the parties have not adequately developed the factual record for it, the Court declines to dismiss this claim on the pleadings and in all likelihood will require a full trial record on which to determine the issue.").

In their motions, Defendants not only attack the veracity of the allegations, they also invite the Court to consider legal questions—such as how Naruto's copyright should be managed—that are not yet ripe. It is true that non-human authorship raises many questions, some of which may later be addressed in this proceeding, and some of which will not. At present, however, the Court is faced with a single, limited question: whether Naruto is an author under the Copyright Act. As the Ninth Circuit has cautioned, in answering this question, the Court should avoid summarily dismissing a claim simply because it is novel and before it can be considered in light of the evidence. *See McGary*, 386 F.3d at 1270.

## V.   CONCLUSION

The Copyright Act was intended to be broadly applied and to gradually expand to include new forms of expression unknown at the time it was enacted. Congress and the courts have explained that copyright protection is critical to ensuring the general public has access to works of authorship. The public places value in these works—and, self-evidently, so do the Defendants. For there to be any copyright protection in Naruto's works at all, the Copyright Act requires that Naruto be classified as their author.

Dated:  December 4, 2015                    Respectfully submitted,

                                            IRELL & MANELLA LLP
                                            David A. Schwarz

                                            PETA FOUNDATION
                                            Jeffrey S. Kerr
                                            Matthew Strugar
                                            Martina Bernstein


                                            By:  /s/ David A. Schwarz
                                                  David A. Schwarz

                                            *Attorneys for Plaintiff*