Pages 1 - 19

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ORRICK, JUDGE

```
NARUTO, a Crested Macaque, by      )
and through his next friends,      )
PEOPLE FOR THE ETHICAL             )
TREATMENT OF ANIMALS, INC.,        )
and ANTJE ENGELHARDT, Ph.D.,       )
                                   )
              Plaintiffs,          )
    v.                             )  NO. 3:15-cv-04324-WHO
                                   )
DAVID JOHN SLATER, an              )
individual; BLURB, INC., a         )
Delaware corporation; and          )
WILDLIFE PERSONALITIES, LTD.,      )
a United Kingdom private           )
limited company,                   )
                                   )
              Defendants.          )  San Francisco, California
_____)  Wednesday, January 6, 2016
```

**TRANSCRIPT OF OFFICIAL ELECTRONIC SOUND RECORDING
OF PROCEEDINGS**

FTR 2:30 p.m. - 2:54 p.m. =  24 minutes

**APPEARANCES**:

For Plaintiffs:         Irell & Manella
                        1800 Avenue of the Stars
                        Suite 900
                        Los Angeles, California  90067
                   BY:  **DAVID ABBA SCHWARZ, ESQ.**



         (Appearances continued on following page.)

Transcribed by:         Leo T. Mankiewicz, Transcriber
                        leomank@gmail.com
                        (415) 722-7045

**APPEARANCES**:   (cont.)

For Plaintiffs:

                PETA Foundation
                1536 16th Street N.W.
                Washington, D.C.   20036
        BY:   **JEFFREY SCOTT KERR, ESQ.**

For Defendant Blurb, Inc.:

                Cooley, LLP
                3175 Hanover Street
                Palo Alto California 94304-1130
        BY:   **ANGELA LUCILLE DUNNING, ESQ.**
                **JESSICA VALENZUELA SANTAMARIA, ESQ.**

For Defendants Wildlife Personalities, Ltd. and David Slater:

                **ANDREW JOHN DHUEY, ESQ.**
                456 Boynton Avenue
                Berkeley, California   94707

1  Wednesday, January 6, 2016

2                                                      2:30 p.m.

3              P R O C E E D I N G S

4       **THE CLERK:**  Calling civil matter 15-4324, Naruto versus David John Slater, et al.  Counsel, please come forward and state your appearance.

7       **MR. SCHWARZ:**  Good afternoon, your Honor.  David Schwarz and my co-counsel Jeff Kerr on behalf of the plaintiff.

9       **THE COURT:**  Good afternoon.

10      **MS. DUNNING:**  Good afternoon, your Honor.  Angela Dunning and my colleague Jessica Valenzuela Santamaria from Cooley for defendant Blurb.

13      **MR. DHUEY:**  Good afternoon, your Honor.  Andrew Dhuey for defendants David Slater and Wildlife Personalities, Limited.

16      **THE COURT:**  Good afternoon.

17      All right.  So there are lots of statutes that protect animals' rights and there are circumstances where humans whose interests are affected by the existence or welfare of the animals have standing to bring suit to protect the animals, and Article III doesn't prevent Congress from granting standing to an animal.  So the issue here is whether they did so in the Copyright Act, and I see no indication that it has.

24      It seems to me that the *Cetacean Community v. Bush* case is on point, that if Congress, and the President, intended

1  to take the extraordinary step of giving animals standing, they
2  would do so plainly.  That's what the case says, and it doesn't
3  appear to me to be true in the copyright case.
4           And I appreciated, Mr. Schwarz, your brief.  I thought
5  it was interesting in making the claim about the breadth of the
6  term "author," but I just don't see that it can be just read as
7  broadly as to go beyond humans, when I'm interpreting the Act,
8  anyway, and I think the Compendium from the Copyright Office is
9  also supportive of my view in that regard.
10          So I'm very happy to take your -- any argument --
11          **MR. SCHWARZ:**  Thank you.
12          **THE COURT:**  -- that you want to make, and then one of
13 my questions at the end will be, assuming I don't change my
14 tentative perspective on this, do you want the opportunity to
15 amend the Complaint.
16          **MR. SCHWARZ:**  We would, your Honor, certainly reserve
17 on that right.  I appreciate the guidance, and I'm going to
18 focus, then, on the two points you've raised.
19          Number one, *Cetacean*.  *Cetacean* does not -- and I take
20 it exactly as language that you read is the language from the
21 case, but it has to be set in the context of what the
22 Administrative Procedures Act is about and how that enables the
23 Endangered Species Act and the Mammal Protection Act, the other
24 statutes that drive the definition of "person," starting in the
25 APA, and then moving over to the Endangered Species Act, which

1   goes through a "person" that may bring it includes anyone,
2   essentially, a party that would be a person, an entity other
3   than a government agency.
4         So why is this different? Well, the purpose of both
5   the APA and the ESA was to define persons who could sue an
6   agency of the federal government, and it sets forth who those
7   are, individual, partnership, et cetera, but the APA and the
8   other statutes which are using it for a springboard for the
9   right of action, these are a very rigorous, highly structured
10  set of procedural rules governing who can sue the government,
11  what they sue the government for, when a case can be brought,
12  how a case can be -- what the exhaustion requirements are, et
13  cetera. It's vastly different, for reasons I'll get to in a
14  moment, from the whole sweep of history and the purpose of the
15  common law which preceded the 1790 Copyright Act to this day.
16        It's fair to say that when the United States
17  government decides who gets to sue it, it is entitled to and
18  expected to define the metes and bounds of what is going to be
19  the standing requirements, and it did so there. There's no
20  quarrel with it. But that's not the thrust of the Copyright
21  Act, and it is very facile, I would suggest, to say that the
22  absence of a definition approaching the Napoleonic Code as to
23  what an "author" would mean somehow excludes nonhuman entities.
24        For example, in the Copyright Act, the word
25  "corporation" is not identified as an author. Yet, the courts

1   and the decisional law interpreting the Act going back over a
2   century have extended protection through the idea of the
3   employer to the corporations themselves.  The whole history of
4   the Copyright Act, beginning with the words in the Constitution
5   and then in the statute itself, "writings," for example,
6   anticipate a vast array of unanticipated technological
7   developments.  So --
8           **THE COURT:**  So is it, in that vast history of common
9   law prior to the Copyright Act, was there -- do you have an
10  example of where an animal is granted a copyright?
11          **MR. SCHWARZ:**  I do not have an example where an animal
12  was granted a copyright.  We can make the counter-argument as
13  to how other humans were denied protection under that law due
14  to the color of their skin.  One could see the contradiction in
15  a statutory interpretation where we see that problem in the
16  antebellum days, but when you look at the cornerstones of
17  copyright --
18          **THE COURT:**  That's quite a stretch, Mr. Schwarz.
19          **MR. SCHWARZ:**  Pardon me, your Honor?
20          **THE COURT:**  That's quite a stretch.  But go ahead.
21          **MR. SCHWARZ:**  And I certainly wouldn't make it the
22  centerpiece of any argument here today, but it is fair to say
23  that before the adoption of the Fourteenth Amendment, the
24  concepts of property ownership in the area of patents
25  foreclosed the ability of a slave to claim ownership to a

1  patent, and likewise foreclosed the ability of the owner of the
2  slave to own the patent.
3           It certainly doesn't answer your question, but it does
4  speak to the evolution of the law, which is really the
5  centerpiece of why the APA is different from the copyright law.
6           And every key aspect of copyright law, the four
7  cornerstones being authorship, originality, substantial
8  similarity and fair use, are common law concepts, not
9  statutorily defined ideas.  Fair use evolved from Justice
10 Story's commentaries in the early 19th Century and it wasn't
11 codified or recognized by Congress until 1976, and when it did,
12 it instructed that the courts should continue to develop these
13 principles.
14          The same applies to substantial similarity.
15 Substantial similarity is not defined in the statute.  It was a
16 product of accumulated wisdom going back to the Statute of Anne
17 in 1709.  In fact, when you really look at the Copyright Act,
18 unlike the APA, which is, you know, a phone book in terms of
19 explaining to people how they navigate through the process of
20 suing the government, there are only really two technical
21 aspects of the copyright statute that are very highly
22 regulated, one dealing with webcasting and the other dealing
23 with the termination of transfer rights.  Other than that, it's
24 been left to the bench to decide how incrementally we move this
25 along.

1                 And I think reading the word "author" and
2     understanding the concept of authorship is the beginning point,
3     and to some degree the endpoint, if we can assume, and as we
4     allege, that Naruto is, in fact, the author in fact of the
5     works at issue.
6                 The other interesting wrinkle to all of this is,
7     Mr. Slater at one point claims that he is the author.  So in
8     many ways, the dispute here isn't over whether there is
9     authorship.  The asserted copyright marking and the publication
10    of the book, and has done so elsewhere, sought cease-and-desist
11    letters against those who he claims are infringing against the
12    use of that photograph.  The question is not whether there's an
13    author.  The question is, who is the author.  But if there an
14    author, then it must follow that there must be a copyright.
15                And to the point about authorship, like the words
16    "writing," which embraces an amazing spectrum of modes of
17    expression that weren't contemplated in 1790, at the time that
18    Congress first adopted this -- the Act, writings essentially
19    came down to books, drawings and maps, and that was, in a way,
20    an interesting aspect of the case that is cited in the
21    Compendium, *Sarony*, and I'll talk about that, where they
22    presaged the idea that mechanical aspects to the creative
23    process, photography in this case, may be part of the creative
24    endeavor that don't necessarily need entirely a human hand.
25                So when the drafters of the Copyright Act

1  intentionally chose not to define "author," but instead adopted
2  the broadest judicial definition, one that's been in place
3  since the mid-19th Century, it really left it up to the court
4  to move incrementally.
5         It's true that there is no express definition of
6  authorship.  Even in *Sarony*, the 1880 case, the Court looked to
7  the definition and concluded that an author is the writer of a
8  literary work or one that originates or gives existence, a
9  source.  It does not foreclose nonhuman origination.
10        And in fact, moving from the 1880s into the world of
11 neural systems and artificial intelligence Professor Miller
12 comments on, we may soon come to the point where we have to
13 confront that very idea of invention through means that do not
14 have in any way the endeavor of the human mind.
15        **THE COURT:**  But isn't this -- this is all a policy
16 argument, it seems to me, that I'm not the person to weigh in
17 on.  This is an issue for Congress and the President.  If they
18 think that animals should have the right to a copyright, then
19 they're free, I think, under the Constitution to do that.
20        But so far, you haven't told me anything that
21 indicates to me that they've done it already.
22        **MR. SCHWARZ:**  But as I said, your Honor, and I think
23 they -- the Congress has left it to you, to make decisions.
24        **THE COURT:**  No, I hear your -- I hear that argument.
25        **MR. SCHWARZ:**  So it isn't merely an exercise in

1  saying, tell me, with a laundry list of who falls within or
2  without author -- authorship.  It is, in fact, exactly how the
3  fair use doctrine expanded over time, and as well work-for-hire
4  concepts.
5       So we're not on such *terra incognita* here.  We are
6  really in a situation where the Court is being asked to look
7  at, admittedly, a very novel argument, and fit it within the
8  four corners of what the word "authorship" means, as it's been
9  used for over a century.
10      And I'll now talk about the Compendium, because
11 I don't think it gets to a satisfactory answer, either.  The
12 Compendium essentially, without much -- with any reasoned
13 analysis, concludes summarily that an animal cannot be the
14 author of a copyright, and it cites two cases.  The first is
15 another 19th century case, the *Trade-Mark Cases*.  That was a
16 case that was cited in the context of whether Congress had the
17 power to enact the first federal trademark statute, and decided
18 that it couldn't be rooted in the copyright and patent clause
19 because a trademark, the Court concluded, does not depend upon
20 any work of the brain.
21      Well, that's precisely the attributes of originality
22 in the 21st Century artificial intelligent context, and here in
23 the question of what the creative impetus, the originality
24 aspect, of what was photographed.
25      So taking that case on its face, it doesn't foreclose

1   the idea of nonhuman inter- -- authorship, and in fact,
2   Professor Miller, commenting exactly on that decision in the
3   context of thinking about nonhuman -- nonhuman authorship, said
4   it would be dangerous to rely on the *dicta* in the *Trade-Mark*
5   *Cases* to support any requirement that a copyrighted work be
6   produced by a human, and obviously, when the decision was made
7   in 1879, the issue of machine creations or nonhuman creations
8   wasn't presented to the court.  So we're looking at, at most, a
9   *dicta* upon which the Compendium was based.
10            So turning to the second case upon which they relied,
11  the *Sarony* case, which is an interesting case because it
12  involves the photograph of Oscar Wilde, and there the courts
13  effectively dodged the question as to whether or not a
14  photograph unaided and unstaged could be entitled to copyright,
15  concluding that there were aspects of intervention in terms of
16  the staging and lighting.
17            But here too we see artistic expression, as admitted
18  by the plaintiff.  We see cause and effect.  We see some
19  intentionality, and based on his own characterization of the
20  photographs.
21            Again, Professor Miller commenting on this same
22  decision said,
23                "It's tempting to read this language as requiring
24            that copyright work be created by a human author, but
25            it's implausible," he continues, "that the court was

1                considering that question in those few isolated
2                passages when it talked about the nature of the human
3                interaction with the camera."
4           The justices again were dealing with 19th Century
5    technology.  They weren't confronting the facts that we have
6    here today, and there are elements to the literal reading of
7    that case.
8           Counsel for Blurb makes the argument by citing to the
9    words "he" and "man."  The Court, when it wrote those words in
10   the late 19th Century, was no more excluding machines from
11   eligibility of authorship than it was excluding women.  It's
12   simply less than meets the eye, in the language of that
13   opinion, and I don't think the Court should feel bound in any
14   way by the notion that those words were used.
15          You are, in a sense, engaged in an interpretive act.
16   I wouldn't call it a policy act.  I would call it an act of
17   trying to give life to new and evolving circumstances to a
18   statute that's been around for a great many years, and that
19   really leads to the final point.
20          It's the interpretive touch, though, of this statute
21   and of the constitutional provision in Article I, Section 8,
22   which is to promote the progress of science and useful arts.
23          When Congress made the policy decision in 1976 to move
24   the statute from a world which only specific works published
25   with notice, and the malady of publication, would receive

1   protection to one where every work of authorship was protected
2   as soon as it was fixed, it recognized that the promotion of
3   the progress of science have a world where all original works
4   of authorship come under copyright, regardless of whether their
5   authors have an intent to seek or exploit those copyrights.
6           And curiously, we see some most innovative and novel
7   works of art generated by elephants that have made the most
8   remarkable stick drawings, and this photograph as well,
9   garnered international celebrity, and there was a reason for
10  that, because people recognize that there was something in this
11  image that advanced society's interest in wanting to protect
12  and advance creative output.
13          And if you want to call that a policy decision, the
14  roots of that are in the Constitution itself.  So yes, if we
15  are here today to protect the public benefit, then the fruits
16  of what has been made and to see to it that those that make it
17  aren't exploited, then I think you're on solid footing, your
18  Honor, to be able to make what is not a quantum leap in terms
19  of recognizing the idea of authorship as going beyond humans.
20          The cases don't categorically lead you to that
21  conclusion, *Cetacean* doesn't, and in fact, when you think about
22  judicially incapacitated people who are not able to protect
23  themselves, the guardianship concept under Rule 17 brings, if
24  you will, or merges, if you will, the idea of protecting the
25  author in fact with the author in law.

1          So I don't think we're in any way, in the highly
2  unusual circumstances of this case, breaking terribly new
3  ground.
4          Contrarily, we also have to ask the question as to
5  whether an opinion or a decision that would limit, as is
6  argued, the protection of copyright only to humans may
7  foreclose other innovations.  At least on that point, I think
8  it's worth a pause to ask whether or not this is as far a step
9  as you would go.
10         I appreciate the Court's indulgence in allowing me to
11  go on for so long.  I do think it is important finally to
12  conclude this:
13         There's obviously value in the copyright.  There's
14  obviously a belief on the part of Mr. Slater that he can
15  exploit the value of the copyright, which is why he sought and
16  has held out as his own the ownership of that.  If that's the
17  case then, then there has to be an author.  Otherwise, he can't
18  make that argument.  Is he going to make a joint authorship
19  argument?  Perhaps, but once he's made the argument that there
20  is an author, then it merely begs the question now before the
21  Court today.
22         **THE COURT:**  Well, isn't the question before the Court
23  today the question of whether Naruto has a copyright interest
24  in that photograph?
25         **MR. SCHWARZ:**  Well --

1         **THE COURT:** It's not Mr. Slater or anybody else. The
2   issue before me, I think you said it in your brief --
3         **MR. SCHWARZ:** Yes.
4         **THE COURT:** -- the very narrow question, and that's
5   the question. It's not anything else.
6         **MR. SCHWARZ:** Well, but --
7         **THE COURT:** You stand by that statement, I assume.
8         **MR. SCHWARZ:** I do, your Honor, but I also -- maybe it
9   wasn't for purely rhetorical purposes to point out the fact
10  that the defendant in the case has made effectively an
11  admission, conversely a claim of authorship. He has not
12  asserted by a counterclaim that he owns it, and yet he's held
13  himself out as the owner.
14        So we do have a situation where there is a concession
15  of authorship, not a concession of public domain. So now we
16  have to answer the question: Is Mr. Slater the author? Is
17  Naruto the author? Is there a joint authorship? Or does it
18  lie in the public domain?
19        So I do agree that the narrow question is the
20  assertion of copyright infringement by Naruto, but it can't be
21  answered in a vacuum if we've got someone waiting in the wings
22  who's claiming that he owns it. We have to -- impliedly that
23  has to be addressed.
24        **THE COURT:** Mr. Dhuey.
25        **MR. DHUEY:** If I had filed a counterclaim, your Honor

1   would have rightly asked me, am I moving to dismiss or am
2   I answering.  We're moving to dismiss, for lack of statutory
3   standing.  So obviously, the issue of -- other issues that my
4   friend here has mentioned are inapplicable.  It's a question of
5   whether a monkey has statutory standing to sue, which it does
6   not.
7           The only comment I have is, I hope your Honor will not
8   exercise his discretion to grant leave to amend the Complaint,
9   because that would serve no purpose.  We're engaging in
10  something of a Socratic debate here, and that is not
11  appropriate.  This is a federal court.  It is plaintiff,
12  defendant, there's an injury.  Here there is no statutory
13  injury, and my client should suffer no more burden defending
14  this case, your Honor.
15          **THE COURT:**  All right.  Thank you, Mr. Dhuey.
16          **MS. DUNNING:**  Good afternoon, your Honor.  Angela
17  Dunning.  I'll just add a few quick points.
18          What plaintiff attempted to do in their brief is
19  change the question for your Honor.  *Cetacean* sets it out very
20  plainly, as your Honor stated:  Does the Copyright Act
21  explicitly grant standing to animals?  The answer is no.
22          Mr. Schwarz would instead like the Court to answer the
23  question, does the Copyright Act preclude standing for animals.
24  That's not the question, your Honor, and it turns the analysis
25  on its head.  You started with the right question.  The answer

1    to that question is no, it does not give standing to animals.
2    That should be the end of the inquiry.
3            I will just add one more point about policy, just
4    because we heard a valiant effort by my colleague here to
5    explain why policy should favor your departing from the
6    instructions the Ninth Circuit has handed down, and I would
7    just say only that if it weren't for the human intervention
8    here, this photo never would have gotten to the public.  If the
9    purpose of copyright is to make sure that these works are seen,
10   that has been accomplished here.
11           Blurb, who is not the owner of the copyright, has
12   never claimed to be, is not the publisher of the book.  Our
13   service was used when we've been sort of dragged into this case
14   by virtue of that, but the photograph has been made available
15   for people to enjoy, thereby serving the purposes of the
16   Copyright Act, only because Mr. Slater saw to it to publish
17   this photograph.
18           So there's not a policy basis for departing from the
19   Ninth Circuit ruling, and we would say that it's dispositive.
20   Thank you.
21           **THE COURT:**  All right.  Any last words, Mr. Schwarz?
22           **MR. SCHWARZ:**  Yes, your Honor.  The idea of standing
23   does not require an author to intend to publish the works
24   himself.  So though it may be seen as paradoxical, the more
25   important concept here is to be able to make sure that there is

1   a statutory framework in which those who are legitimately
2   claimed as authors may be able to secure protection.
3            Authorship is not defined, and nonetheless, the ideas
4   have become sufficiently elastic, both in terms of what a
5   writing is or author is, that we are not so bound by the idea
6   that, as to this animal, there must be an express statutory
7   authorization, any more than perhaps in the future we look at
8   things that are to be created by machines that may themselves
9   not fit within the neat definition of a human.
10           Thank you, your Honor.
11           **THE COURT:**  All right, thank you.
12           So Mr. Dhuey, I'm very much inclined to grant leave to
13  amend, because leave to amend is supposed to be freely given,
14  and I've had somebody from the Ninth Circuit tell me that
15  I should have granted it in another case, not fortunately the
16  majority of them, but so --
17           **MR. DHUEY:**  Perhaps the other side might proffer what
18  would be the amendment.
19           **THE COURT:**  Well, I think the other side will be
20  thinking, once they get my opinion, assuming that I don't
21  change my mind -- and I don't think I have, Mr. Schwarz -- what
22  else they might say, and if you have -- if you conclude,
23  Mr. Schwarz, that you've got the issue that you want to be
24  raising on appeal, then I assume that you won't be amending,
25  but if there's something more that you think you can say to

1  address the Court's concerns, you will be freely given that
2  right.
3           **MR. SCHWARZ:** And we will, your Honor, look carefully
4  at the court's opinion, and with that in mind, make a decision
5  going forward.  Thank you, your Honor.
6           **THE COURT:** All right.  Well, thank you all very much.
7                                                          <u>2:54 p.m.</u>
8                              ---o0o---

1
2
3         **CERTIFICATE OF TRANSCRIBER**
4
5         I, Leo Mankiewicz, certify that the foregoing is a
6  true and correct transcript, to the best of my ability, of the
7  above pages of the official electronic sound recording provided
8  to me by the U.S. District Court, Northern District of
9  California, of the proceedings taken on the date and time
10 previously stated in the above matter.
11        I further certify that I am neither counsel for,
12 related to, nor employed by any of the parties to the action in
13 which this hearing was taken; and, further, that I am not
14 financially nor otherwise interested in the outcome of the
15 action.
16
17 _____   01/22/2016
18      Signature of Transcriber         Date
19
20
21
22
23
24
25